Johnie YOUNG, Plaintiff,

v.

**EDGCOMB STEEL COMPANY,**
**Defendant.**

No. C-279-G-70.

United States District Court,
M. D. North Carolina,
Greensboro Division.

Sept. 7, 1973.

---

J. LeVonne Chambers, and Robert Belton, Charlotte, N. C., and Adam Stein, Chapel Hill, N. C., for plaintiff.

W. S. Blakeney, Charlotte, N. C., for defendant.

## MEMORANDUM OPINION AND ORDER

GORDON, Chief Judge.

Johnie Young, the plaintiff, a forty-three year old Negro, filed a charge of racial discrimination with the Equal Employment Opportunity Commission (EEOC) on March 13, 1969, alleging that his employer, Edgcomb Steel Company, the defendant, had denied him advancement on account of his race. Young's charge was investigated by the EEOC, but no decision was rendered. On or about November 23, 1970, the plaintiff received a letter dated November 20, 1970, from the EEOC advising him of his right to institute a civil action in a United States District Court within thirty days of receipt of the letter. On December 10, 1970, within the allotted thirty days, the plaintiff instituted this individual and class action under § 2000e et seq. and § 1981 of Title 42, United States Code. After extensive discovery the case was tried by the Court without a jury on February 26 and 27 and March 8, 1973.

The defendant is a corporation licensed to do business and doing business in North Carolina. Its main office is in Philadelphia, Pennsylvania, and there are plants in Pennsylvania, New York, South Carolina and North Carolina. The Greensboro, North Carolina, plant, which is involved in this suit, is a metal processing center. It receives semi-finished steel and aluminum and processes it into sheets, bars, coils, and tubing for industrial use.

There are currently three divisions in the Greensboro plant: (1) Outside Sales, (2) Office and Inside Sales, and (3) Warehouse. Richard A. Deal is Sales Manager in charge of Outside Sales; Herbert R. McCorkle, Jr., is Office Manager and Paul Dwyer is Plant Superintendent. Peter B. Kline is Vice-President and General Manager of the Greensboro plant. The Outside Sales Division includes the sales manager and outside salesmen. The outside salesmen travel the geographical area served by the Greensboro plant, meet customers in person, sell the Company's products, and make new contacts for future sales. The Office and Inside Sales Division includes the office manager, who runs the division; the credit manager; inside salesmen, who deal with customers by telephone and by letters relative to inquiries and orders and maintain proper inventory through periodic mill purchases; clerical personnel; order writers; secretaries; and telephone operators. The Warehouse Division includes the plant supervisor; traffic manager; foremen; maintenance operator; orderman, who assembles metal from plant inventory pursuant to customers' orders; operator, who operates equipment in the plant; helper, who assists the operator; truck driver; receiving inspector; truck loader; truck washer; coil handler and starters, who are learning a job.

The two major job categories within the warehouse are operator and orderman. The operator runs an assigned

piece of equipment, including shearers, saws, slitters, levelers, edgers, and cranes, and actually processes the metal. The operator's job requires a certain amount of skill unique to the piece of equipment being used. The orderman takes a customer's order from the foreman and processes the order for shipment by taking the metal out of its rack, putting a strap around it, and tagging it. Ordermen also unload incoming trucks.

Inside salesmen at Edgcomb Steel's Greensboro operation service a geographical area of North Carolina north of the Yadkin River and all of Virginia except for the area adjacent to Washington, D.C. While outside salesmen travel around the area making personal contacts with potential or current customers, inside salesmen operate from the Greensboro office by letter and telephone. Inside salesmen follow up the contacts made by outside salesmen by telephone, and service all customer accounts. Each inside salesman specializes in a particular company product, for example, aluminum sheets, or cold finished bars, but also handles inquiries about other products when necessary. Inside salesmen keep track of how much is bought and sold in a given period and estimate how much may be needed in the future. The job requirements for inside sales include a knowledge of basic math, and the ability to communicate with people on the telephone, to make written reports, to handle paper work, to work under pressure, and to come to a logical conclusion given certain facts.

Within the warehouse all employees except foremen are paid hourly wages. The amount of any one employee's wages is governed by the type of job he holds and the length of his term of employment. Hourly wages range from $2.25 per hour to $4.35 per hour. In addition to regular pay, the plant's hourly-paid workers often work overtime, for which they are paid one and one-half times their standard hourly wage. Foremen are salaried employees. Their salaries range from $850.00 to $1,000.00 per month. These salaries are greater than the regular pay, without overtime, of every hourly-paid employee and, in the vast majority of cases, are greater than the pay of such wage-earners even when overtime is taken into account.

As of January 20, 1972, every inside salesman was making from $600.00 to $925.00 per month. In addition to their salaries, inside salesmen are paid sizable bonuses each year, the amount of such bonuses depending in part on the performance of each individual salesman. While the starting salary of an inside salesman is not as great as the hourly wages of some warehouse employees, there is an opportunity for advancement in salary to an amount greater than that received by any wage earner.

On July 2, 1965, the date the 1964 Civil Rights Act (including now codified § 2000e et seq.) became effective, and on September 8, 1971, the date of plaintiff's interrogatories, the following racial distribution of personnel existed at defendant's Greensboro Plant:

| Job | July 2, 1965 | | Sept. 8, 1971 | |
|---|---|---|---|---|
| | Black | White | Black | White |
| Outside Sales | — | 4 | — | 6 |
| Inside Sales | — | 9 | — | 11 |
| Clerical | — | 10 | — | 6 |
| Order Writer | — | 3 | — | 4 |
| Secretary | — | 2 | — | 2 |
| Stenographer | — | — | — | 4 |
| Telephone Operator | — | 1 | — | 1 |
| Maintenance Operator | — | 1 | — | 1 |
| Receiving Inspector | — | — | — | 1 |
| Traffic Manager | — | 1 | — | 1 |
| Starter Helper | — | 1 | — | — |
| Foreman | — | 3 | 1 | 4 |
| Orderman | 6 | 3 | 3 | 5 |
| Operator | 3 | 4 | 9 | 6 |
| Helper | 4 | 6 | 1* | 4 and 1* |
| Truck Driver | 7 | — | 8 | — |
| Truck Loader | 2 | — | 2 | — |
| Truck Washer | 1 | — | 1 | — |
| Coil Bander | — | — | 2 | 1 |
| * On Military Leave | | | | |

At the date of the trial herein, the defendant had hired two black inside salesmen and two black office workers for the Credit Department. Before these hirings, there had never been a black

employed in two of the three divisions of the Company: Outside Sales and Office and Inside Sales. Thus, prior thereto, no blacks had ever been employed in front office or "white collar" positions.

There are no written job descriptions for any jobs in Edgcomb's Greensboro operations and there are no lists of qualifications required for any job. There are no formal training programs for any job and there is no central personnel office or single person in charge of personnel. Announcements of openings in the office and inside sales division are made in various ways. Often, but not always, notice of an inside sales opening has been posted on the warehouse bulletin board. Openings for other office jobs have most frequently been publicized by word-of-mouth among the present office workers.

Paul Dwyer, Plant Superintendent, is responsible for hiring, firing, and promoting within the plant, and Herbert McCorkle, Jr., Office Manager, is responsible for hiring, firing, and promoting within the office. Richard A. Deal, Sales Manager, in charge of outside sales, is consulted with regard to employment in outside sales. In considering a person for transfer from the plant to inside sales, McCorkle is consulted, but Peter Kline, Vice-President and General Manager, makes the decision whether the transfer is or is not allowed.

In 1967, defendant instituted the Wonderlic Personnel Test as a means of evaluating prospective inside salesmen. Before 1967, no personnel tests were used at the Greensboro operation for any job. Kline personally made the decision to institute the Wonderlic Test. Kline has a B.S. Degree from Princeton in Mechanical Engineering, but no expertise in psychology or personnel studies. Kline testified that he instituted the test because he had wanted an additional factor for consideration in hiring. The only person Kline consulted with in reference to instituting the test was McCorkle.

The test is given to persons applying for transfer to inside sales and to persons applying for jobs in sales from outside the Company. In 1970, the same test was used as part of the screening process for applicants for clerical and secretarial positions. The test is apparently occasionally waived.

Four forms of the Wonderlic Test, Forms "A" and "B", "1" and "2", are used indiscriminately, and are generally equivalent. Each applicant takes only one test, using one of the four forms. Each test contains fifty questions, and an applicant is given twelve minutes to answer as many questions as possible. The score is the total correct answers out of the number completed. McCorkle administers and grades the tests, and although there is no formal company policy in regard to the tests, 19 to 21 is considered a passing score.

No outside expert has been consulted about what test, if any, should be used, or how to administer or interpret the tests and scores for any purpose, and there has never been a meaningful validation made of the test.

On October 1, 1969 (after plaintiff's charge was served on Edgcomb), Kline and McCorkle attempted to validate the test's results against the job performances of five white inside salesmen. No blacks were included. McCorkle and Kline claim that the scores corresponded to the job performances of these employees. This evaluation was purely subjective. Furthermore, there was no correlation between the test scores of these five inside salesmen and their present salaries. The salesman who made the lowest score had the third highest salary, while the salesman with the third highest score has the lowest salary. One of the five inside salesmen actually failed the test by scoring 17, two points below the minimally acceptable score of 19.

The discriminatory impact of the Wonderlic Test has been widely noted particularly in the wake of the Supreme Court decision in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.

2d 158 (1970). See also, Moody v. Albemarle Paper Co., 474 F.2d 134 (4th Cir. 1973).

Moreover, from a study, in which 251,-253 job applicants, including 38,452 blacks, took the Wonderlic Test, the creators of the test determined that it discriminated against blacks. (See E. F. Wonderlic & Associations, Inc., Negro Norms, A Study of 38,452 Job Applicants for Affirmative Action Programs, 1971, pp. 1–75). The study concluded that:

"The vast amount of data studied in this report confirms that a very stable differential in raw scores achieved by Negro Applicant Population exists. Where Education, Sex, Age, Region of Country and/or Position Applied for are held constant, Negro-Caucasian Wonderlic Personnel Test Score differential are consistently observed. The mean score differentials are, as other researchers have noted in the study of mental ability, about one standard deviation apart when comparison of Caucasians and Negroes are studied. This disparate effect can be compensated for through the use of percentile evaluation of normative groups or through the use of point conversions similar to those used with age. A conversion of 8 points will almost universially correct for the disparate effect." (Wonderlic Study, p. 3)

There is nothing in the evidence of this case which suggests that the defendant ever took account of the discriminatory impact of the test.

The defendant seeks persons to fill openings in inside sales first from workers in the warehouse and then from sources outside the Company. Applicants for transfers to inside sales from the warehouse are judged on their attitude toward the Company, on the performance, knowledge of the Company's product, diplomacy, initiative, attention to detail, interest in the job, all-around ability, and test score on the Wonderlic Test. Prospective employees from outside the Company are measured by the same standards with the exception of on-the-job performance. Despite the existence of other considerations, passing the Wonderlic Test has been a usual and major prerequisite for hiring in or transfer to inside sales.

No black person has ever been transferred from the plant into inside sales. However, five white persons have transferred from the plant to inside sales. Four of these men were initially hired as starter-helpers on plant machinery, and the other as a shipping clerk. Two were hired in 1959, and one each in 1960, 1963, and 1964. All but one were transferred to inside sales within four years.

Johnie Young is 41 years old and is black. He completed the eleventh grade in Prosperity, South Carolina, and served two years with the U.S. Army Transportation Corps in Europe from 1951 to 1953. He completed three years at A & T Technical Institute, including courses in business, business law, mathematics, and English, in preparation for opening a brick masonry business. He was employed in the brick masonry business for two years, and on January 17, 1958, joined Edgcomb Steel in Greensboro as a shear helper. He has been employed by Edgcomb for fourteen years, and since 1960 as a shear operator.

The plaintiff has repeatedly sought a transfer to inside sales. The first time he sought information on promotions was while he was still a shear helper, in 1959–60. In 1967, before Jerry Fields, a white shear operator, was transferred to inside sales, Young talked to Kline about a sales job. Kline told Young in a personal interview that Young would be considered for the next salesman's job which became available. Nevertheless, Young was not consulted again, and Jerry Fields was given the next opening in inside sales.

In 1967, the Wonderlic Personnel Test was instituted at Edgcomb. Young was allowed to take the test on March 10, 1969. Although the test was given to two whites in 1967 and 1968, four other

white men were hired in 1968 without first taking the test. It was only at the time that Young was tested that the test was regularly given and relied upon for those seeking positions as inside salesmen.

Even though the Wonderlic Test is usually given to only one person at a time, privately, in an enclosed conference room, Young took the test with three other persons from the plant. Young was not allowed to take the test privately in an enclosed area, but was placed at a desk in the inside sales room with persons talking and telephones ringing while he tried to concentrate. Young failed the test with a score of 6, and was told by Kline that the test could not be taken again.

Kline refused Young's request for transfer to inside sales largely on the basis of Young's performance on the test. He never had an in-depth interview with Young for the purpose of determining Young's qualifications for an inside sales position. He did not consult the office manager, Herbert McCorkle, for his recommendation on Young. McCorkle's deposition testimony supports the conclusion that Young was denied transfer largely on the basis of his test score:

"Q. Did you participate in the decision as to whether or not he [Young] ought to become a salesman?

"A. [McCorkle] In a manner of speaking, yes. After the test results were ran. Yes.

"Q. Well, just tell us what your recommendation was; what you did; what recommendations, if any, you had.

"A. There wasn't really any recommendation on either side, as a result of the test score."

Deposition of Herbert R. McCorkle, February 23, 1971, p. 17.

Plaintiff Young contends that he was denied a transfer to inside sales because he is black. He sues on his own behalf seeking a court order requiring the defendant to transfer him to inside sales and awarding him damages for the salary lost during the years when the plaintiff should have had, but for defendant's alleged discrimination, an inside sales job.

Young also sues on behalf of all blacks who are past, present or prospective employees of the defendant to enjoin all of the defendant's discriminatory hiring and transfer procedures. The defendant argues that the class should be limited to only those blacks who have sought and been denied transfers. It is true that the evidence has failed to reveal a single black from outside the Company who has applied for and been denied a job with the Company, on racial or any other grounds. On the other hand, statistical evidence tends to show that whites have been preferred to blacks for certain jobs. The Court notes that the defendant's practice of publicizing openings in secretarial and clerical jobs through word of mouth among present employees may discriminate against blacks in general without creating any specific cases of individualized discrimination. Moreover, since defendant's hiring practices are so closely akin to its transfer procedures about which plaintiff Young complains, the broad class urged by plaintiff will be recognized. The Court finds the class to consist of all Negroes who have been, are, or will be employed, or applying for employment with the defendant in its Greensboro, North Carolina, plant.

### DISCUSSION

This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII) and 42 U.S.C. § 1981. The pertinent provisions from Title VII of the Civil Rights Act of 1964 are as follows:

42 U.S.C. § 2000e—2(a):

"It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise

to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

42 U.S.C. § 2000e—2(h):

"Notwithstanding any other provision of this title, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin."

42 U.S.C. § 2000e—5(g):

"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice). Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."

42 U.S.C. § 2000e—5(k):

"In any action or proceeding under this title the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person."

The pertinent language of 42 U.S.C. § 1981 provides as follows:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . ."

These statutory provisions must be applied to the facts established in this case in conformity with the mandate of the United States Supreme Court governing the construction to be accorded. In the landmark case of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Court wrote:

"The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S. at 429–430, 91 S.Ct. at 853.

The Court clearly held that Title VII is directed to the practical operative effects of employment practices:

"What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification. . . ." 401 U.S. at 431, 91 S.Ct. at 853.

"[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability.

. . . . . .

". . . Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." Id. at 432, 91 S.Ct. at 854.

Two of the employment procedures questioned in this case are the use of subjective criteria to determine a person's fitness for a certain job and the word-of-mouth publication of job openings in the office. Statistics may show that an employment procedure, although seemingly "neutral," operates to "freeze" a certain class of employees out of the more economically rewarding jobs. In Rowe v. General Motors, 457 F.2d 348 (5th Cir. 1972), the Fifth Circuit dealt with such a case. There, promotion from hourly to salaried jobs at a General Motors plant was based entirely on the subjective evaluation and decision of plant foremen. The court looked to the statistical effects of this subjective system to determine if it was discriminatory. It found: "The figures are here vivid and significant. They reveal . . . a great disparity in employment opportunities for Blacks which . . . shows that Blacks . . . do not get the same advances as do Whites." Rowe, supra, at 357. The court went on to state that the figures establish the plaintiffs' case unless the defendant meets its "burden of demonstrating why, on acceptable reasons, the apparent disparity is not the real one."

Rowe, supra, at 358. The court held that the defendant did not meet this burden.

The Fourth Circuit, in Brown v. Gaston County Dyeing Machine Co., 457 F. 2d 1377 (4th Cir. 1972) made findings similar to Rowe. Blacks were not employed in 34 of 45 job classifications at the Gaston plant, and held almost no higher paying and higher status jobs and a much larger percentage of lower-status, lower-pay positions. Recognizing that proof of overt racial discrimination is seldom direct, the court found error in limiting Title VII to particular acts of intended discrimination. The court said that statistical patterns, practices, and general policies should be considered in determining whether discrimination exists. It quoted United States v. Bethlehem Steel, 446 F.2d 652, 655 (2nd Cir. 1971): the lack of "fixed or reasonably objective standards and procedures for hiring" is a discriminatory practice. The court then found that the Gaston company did not have "objective guidelines for hiring, for pay increases within job classifications, and for promotion or transfer from one job to another." Moreover, the practice of publicizing job openings by word-of-mouth rather than posting notices was found suspect. While these practices may appear neutral and impartial on their face, the court noted that they may generate segregation as effectively as overt discrimination. The court then held:

"Here, in the absence of objective criteria applied to all workers alike, the statistics indicate that race is the only identifiable factor explaining the disparity between the jobs held by white employees and those held by black employees. The proof discloses no objective standards based on education, experience, ability, length of service, reliability, or aptitude to account for the preferential employment of white workers . . . [Thus] the lack of objective guidelines for hiring and promotion and the failure to post notices of job vacancies are badges of discrimination that serve to corrobo-

rate, not to rebut, the racial bias pictured by the statistical pattern of the company's work force." 457 F.2d at 1383.

■ Thus, the *Brown* court held that where subjective criteria for hiring or promotion is used and where statistical evidence tending to show racially identifiable jobs is unrebutted, then the use of subjective criteria is itself a discriminatory practice. "Elusive, purely subjective standards must give way to objectivity if statistical indicia of discrimination are to be refuted." 457 F.2d at 1382.

■ The plaintiff also contends that the defendant's use of the Wonderlic Test is biased against blacks. In determining whether use of a test is racially discriminatory, two factors are to be considered: (1) whether the test has a discriminatory impact; and (2) whether this racial impact, if any, can be adequately justified by nonracial reasons for its use. See generally, Griggs v. Duke Power Co., *supra*. If a plaintiff is successful in proving the racial impact of the test, the burden is on the defendant to justify the test by showing a nonracial "business necessity" for its use. This burden is very strict. *See,* Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971).

■ Although § 2000e—2(h) specifically authorizes professionally developed tests not used to discriminate, *Griggs* makes it clear that that section allows only those tests proven to be job related. In so holding, the court specifically endorsed the E.E.O.C. Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.1–14 as "expressing the will of Congress" (401 U.S. at 434, 91 S.Ct. 849). Guideline 1607.3 states that a test which has an adverse racial impact is saved under § 2000e—2(h) only if:

"(a) the test has been validated and evidences a high degree of utility as hereinafter described, and (b) the person giving or acting upon the· results of the particular test can demonstrate that alternative suitable hiring, transfer or promotion procedures are unavailable for this use."

In Moody v. Albemarle Paper Co., 474 F.2d 134 (4th Cir. 1973), the Fourth Circuit dealt with a case substantially similar to this one. In Moody, the defendant utilized the Wonderlic Test in screening prospective employees. Since the Wonderlic Test had been found racially discriminatory, the court scrutinized the employer's validation procedure to determine whether use of the test was justified. It found and held as follows:

"In developing criteria of job performance by which to ascertain the validity of its tests, Albemarle failed to engage in any job analysis. Instead, test results were compared with possibly subjective ratings of supervisors who were given a vague standard by which to judge job performance. . . .

"[S]ome form of job analysis resulting in specific and objective criteria for supervisory ratings is crucial to a proper concurrent validation study. . . . To require less is to leave the job relatedness requirement largely to the good faith of the employer and his supervisors. The complaining class is entitled to more under the Act."

## CONCLUSIONS OF LAW

Applying the above legal principles to the case at hand, the Court draws these conclusions:

■ 1. This Court has jurisdiction of this action under the provisions of 42 U.S.C. § 2000e—5(f). Jurisdiction is further authorized by 28 U.S.C. § 1343 and 42 U.S.C. § 1981.

■ 2. Edgcomb Steel Company is an employer in an industry affecting commerce within the meaning of 42 U. S.C. § 2000e(b).

3. Plaintiff has complied with the procedural requirements of 42 U.S.C. § 2000e—5(a), (d), and (e).

4. This action is properly maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The affected class for purposes of the general injunctive relief to which the class is entitled is composed of all black persons who have been, are, or will be employed, or applying for employment at the defendant's Greensboro, North Carolina, plant.

■ 5. The reliance by the defendant upon subjective factors in making decisions concerning hiring, promotion and transfer and the use of word-of-mouth publication of job openings have resulted in racial discrimination in violation of 42 U.S.C. § 2000e—2(a) and 42 U.S.C. § 1981.

■ 6. The use by the defendant of the Wonderlic Test has had a racially discriminatory effect, has not been shown to be job-related and has not been used in compliance with Testing and Selecting Employee Guidelines of the Equal Employment Opportunity Commission. (29 C.F.R. 1607) The test used in this context is therefore not one authorized by 42 U.S.C. § 2000e—2(h). It thus has been used in violation of 42 U.S.C. § 2000e—2(a) and 42 U.S.C. § 1981.

■ 7. The defendant has denied Johnie Young's request for transfer to the position as an inside salesman because of his performance on the Wonderlic Test, which was given under strained circumstances and without proper validation. The defendant thus violated 42 U.S.C. § 2000e—2(a) and 42 U.S.C. § 1981.

8. The defendant has intentionally engaged and is engaging in the unlawful employment practices described herein within the meaning of 42 U.S.C. § 2000e—5(g).

### RELIEF

Title 42, United States Code, § 2000e—5(g) authorizes courts to enjoin employers from engaging in unlawful employment practices and to order such affirmative relief as may be appropriate, which may include promotion or hiring of employees, with or without back pay. Moreover, the plaintiff may be awarded costs and attorney's fees. The Fourth Circuit has heretofore directed entry of fitting relief under § 2000e—5(g) in both United States v. Dillon Supply Co., 429 F.2d 800, 804, and Robinson v. Lorillard Corp., *supra*. It is the duty of this Court, therefore, to fashion an appropriate remedy in this case.

■ However broad the Court's power to grant relief, it is tempered by the following pronouncement in Griggs v. Duke Power Co., *supra*:

"Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant."

It follows, before the Court can order the defendant herein to transfer plaintiff Young to inside sales and to pay him back salary, plaintiff Young must meet the qualifications of that job. The testimony of Johnie Young at trial and his written complaint to the E.E.O.C., admitted as evidence herein, prove to the Court that he is not so qualified.

As previously stated, the job of inside salesman requires a person who can deal with customers by telephone and letters and who can make written reports. These abilities are essential. Johnie Young's complaint to the E.E.O.C. shows that he has a limited command of the written English language. It is characterized by frequent misspellings and use of poor grammar and improper punctuation. Such writing would be totally unacceptable in correspondence with customers from inside salesmen on behalf of the defendant corporation. In testifying, Young demonstrated a difficulty

in understanding and pronouncing the names of his co-workers. For instance, he repeatedly pronounced the name of Herbert McCorkle as "McCormick." He did this despite having known and dealt with McCorkle for at least six years. This inability to deal with people verbally by perceiving and using their correct names further disqualifies Young as an inside salesman. Such being the case, the Court will not grant plaintiff Young the special relief of promotion and back pay. Instead, he will be granted the same relief as the other members of his class.

The relief for the class must also be tempered. Although, as the Court concluded above, the hiring and promotion procedures employed by the defendant have resulted in discrimination in the past, as evidenced by certain statistics, the recent hiring of two black inside salesmen and two black office employees indicate that the defendant's hiring procedures, except for the use of the Wonderlic Test, no longer have discriminatory effects. Additionally, these hirings demonstrate the defendant's efforts to eliminate the effects of discrimination in prior years. Due to this progress, the Court will leave intact most of the defendant's employment and transfer procedures. It will, for the most part, suffice for the Court to retain this case on its docket for one year. If, at the end of this period, the Court finds that the defendant's employment policies have completely eliminated the unlawful practices prohibited by § 2000e—2(a), it will dismiss the action. However, if any unlawful employment practices remain, the Court will order appropriate injunctive relief. *See* Brown v. Gaston Co. Dyeing Machine Co., *supra*.

Still, there are certain areas where past practices, and the potential for future discrimination, require the Court to grant some injunctive relief now. The defendant must cease its use of the Wonderlic Test. No business necessity has been shown for using a test of such clear racial impact. Moreover, all openings in the Greensboro plant must be posted in a conspicuous place in the warehouse, and openings in the Office and Inside Sales Division must be advertised before the general public in the Greensboro area through a widely dispersed media. Finally, defendant shall draw up and use in its hiring procedures written job descriptions and lists of qualifications.

For the foregoing reasons, it is ordered that:

1. The defendant shall cease using the Wonderlic Test as a consideration in hiring and promoting.

2. The defendant shall post in a conspicuous place in its Greensboro warehouse notice of each opening in the Greensboro plant. Moreover, the defendant shall place before the general public in the Greensboro area through a media of wide distribution notice of openings in its Office and Inside Sales Division.

3. The defendant shall draw up and use in its hiring procedures job descriptions and lists of job qualifications for all jobs at its Greensboro plant.

4. The Court shall retain this suit for one year, at the end of which a hearing shall be held to determine whether or not further injunctive relief will be necessary.

5. The plaintiff is entitled to recover costs and reasonable attorney's fees. He shall file and serve within twenty days his proposed costs and fees. Within twenty days thereafter, the defendant may file and serve his exceptions, if any, to such proposal. The Court will then enter an appropriate order.