Winifred S. NANCE, Plaintiff,

v.

UNION CARBIDE CORPORATION, CONSUMER PRODUCTS DIVISION, a corporation, Defendant.

No. C–C–72–185.

United States District Court, W. D. North Carolina, Charlotte Division.

April 28, 1975.

438

Robert Belton and Jonathan P. Wallas, Charlotte, N. C. (Chambers, Stein & Ferguson, Charlotte, N. C.), for plaintiff.

J. Frank Ogletree, Jr., H. Lane Dennard, Jr., and Guy F. Driver, Jr., Greenville, S. C. (Thompson, Ogletree & Deakins, Greenville, S. C.), for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McMILLAN, District Judge.

Winifred S. Nance, the plaintiff, a white female, filed this suit on August 18, 1972, against Union Carbide Corporation of Charlotte, North Carolina, alleging that she was subjected to discrimination because of her sex in the matter of employment, classification, promotion and other incidents of employment. The complaint alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000e et seq. This matter came on for a hearing in March, 1974 and December, 1974 and the Court, after consideration of the evidence, enters Findings of Fact and Conclusions of Law as follows:

## FINDINGS OF FACT

1. Plaintiff, Winifred S. Nance, is a female citizen of the United States and the State of North Carolina, residing in Charlotte, Mecklenburg County, North Carolina. The plaintiff has been employed by the defendant at its Charlotte plant since July 8, 1952.

2. The defendant, Union Carbide Corporation ("defendant" or "Company"), is a corporation organized under the laws of the State of New York and does business in all fifty states, including the State of North Carolina. The defendant maintains its corporate headquarters in New York City, New York.

3. The defendant operates a battery manufacturing facility in Charlotte, Mecklenburg County, North Carolina ("Charlotte plant").

4. The majority of the work performed (80–90%) at the Charlotte plant is pursuant to contracts with various federal agencies and the majority of these contracts are with the Department of the Army.[1]

5. The hourly paid work force at the Charlotte plant is organized into approximately sixteen (16) departments. The departments and a general description of the work performed in each are as follows:

*Department 107:* Blends proper amounts of ingredient into mixes to be used in the manufacture of Magnesium and LeClanche cells.

*Department 161:* Produces magnesium cells to be used in the manufacture of magnesium batteries.

*Department 208:* Produces LeClanche flat cells by the non-refrigerated method and ties into appropriate stacks for subsequent use in scheduled LeClanche battery types.

*Department 209:* Produces LeClanche flat cells by the refrigerated method and ties into appropriate stacks for subsequent use in scheduled LeClanche battery types.

*Department 210:* Repairs cell stacks rejected at testing in the battery finishing department.

*Department 215:* Produces LeClanche round cells to be used in the manufacture of LeClanche batteries.

*Department 225:* Assembles all required parts into finished batteries.

1. By virtue of the fact that the majority of the work performed by the defendant at its Charlotte plant is pursuant to contracts with the federal government, the defendant is subject to Executive Order 11246 and the Regulations implementing this Order. See Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980, 984, n.3 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1969). Executive Order 11246 is a federal regulation that requires all employers subject to this Order not to discriminate against its employees or applicants for employment because of race, color, religion, sex or national origin. Executive Order 11246 became effective on October 24, 1965. 30 F.R. 12319; 3 C.F.R. 339. This Order was amended by Executive Order 11375, signed on October 13, 1967, which became effective in part on November 12, 1967, and in part on October 14, 1968, by substituting the word "religion" for "creed" as a prohibited basis of discrimination, and by adding sex as a prohibited type of discrimination. 32 F.R. 14303.

*Department 235:* Manufactures parts to be used in the production of cells and finished batteries.

*Department 300:* Cleans-up plant and machinery.

*Department 304:* Provides employee relations department duties, such as pick-up and deliver mail; picks-up machinery parts; operates the canteen and operates the cash register in the cafeteria.

*Department 311:* Cooks, serves meals and cleans-up cafeteria.

*Department 327:* Provides upkeep of the plant building and services, installs, repairs, builds and maintains plant equipment.

*Department 342:* Warehousing-shipping-receiving, and supplying parts for the manufacturing departments as requested.

*Department 354:* Provides production line inspection of all operations.

*Department 355:* Sets up and checks on all inspection procedures within an assigned area.

*Department 440:* Machine operator adjuster.

6. There are over 160 different job classifications in the 16 departments at the Charlotte plant. The overwhelming majority of these job classifications are unskilled jobs.

7. The wage rate of each job is determined by the job class to which it is assigned. Unskilled jobs are designated as job classes 1 through 12 with job class 1 with the lowest rate and job class 12 with the highest rate. Skilled jobs are separately designated as job classes 1 through 7 and are some of the highest paying jobs at the Charlotte plant.

8. The majority of the female employees as of July 2, 1965, and August 8, 1972, were employed in unskilled job classes 1–7. All of the female employees in job class 9 were employed in depart-

ments 225 and 355; these departments have been two of the departments in which females have been employed.

9. Many of the jobs designated as "heavy" jobs do not, in fact, have a weight lifting (or exerted force factor) of 30 pounds or more. For example, the oiler's position in department 327 has an average exerted force of 15 pounds 50% of the time during the course of an eight-hour working day; outside warehouse operator in department 342 has an average exerted force of 2 pounds 75% of the time and 30 pounds 5% of the time; round cell machine operator/adjuster in department 440 has an average exerted force of 18 pounds 33% of the time and a maximum force of only 70 pounds 1% of the time; and process repair in department 225 has an average exerted force of 5 pounds 25% of the time (or 10 pounds 10% of the time) and only 85 pounds 1% of the time.

10. On July 2, 1965 (the effective date of Title VII), July 2, 1970, and August 18, 1972 (the date the complaint was filed in this Court) the staffing of the various departments by sex at the Charlotte plant was as follows:

| Department | 7–2–65 | | 7–2–70 | | 8–18–72 | |
|---|---|---|---|---|---|---|
| | M | F | M | F | M | F |
| 161 | – | – | – | – | 4 | 7 |
| 107 | 6 | – | 4 | – | 3 | – |
| 208 | 23 | 49 | 8 | 19 | 6 | 17 |
| 209 | 18 | 37 | 11 | 29 | 6 | 17 |
| 210 | – | – | – | 3 | 1 | 5 |
| 215 | – | – | – | – | – | – |
| 225 | 74 | 57 | 37 | 65 | 50 | 77 |
| 235 | 19 | 5 | 15 | 2 | 11 | 1 |
| 300 | 14 | – | 9 | 2 | 5 | 8 |
| 304 | – | – | 1 | – | – | 1 |
| 311 | 2 | 3 | 1 | 4 | 1 | 4 |
| 320 | – | – | 2 | – | 2 | – |
| 327 | 36 | – | 39 | – | 44 | – |
| 342 | 10 | – | 10 | – | 12 | – |
| 354 | – | 38 | – | 31 | – | 29 |
| 355 | 17 | 2 | 12 | 3 | 11 | 7 |
| 440 | 9 | – | 7 | – | 7 | – |
| Totals | 228 | 191 | 156 | 158 | 163 | 173 |

11. An analysis of the work force by sex as set forth in Finding No. 10 above shows the following:

(a) As of July 2, 1965, there were 419 hourly paid employees at the Charlotte

plant; of these 228 were males and 191 were females. Of the 191 females, 181 or approximately 95% of the females were employed in only four (4) of the sixteen (16) departments (208, 209, 225 and 354). Only 115 or 50% of the males were employed in these same four departments. There were no males in department 354 and no females were employed in department 327 (skilled trades department).

(b) As of July 2, 1970 (five years after the effective date of Title VII), there were 314 employees; of these 156 were males and 158 were females. Of the 158 females 144 or approximately 91% were employed in only four (4) of the sixteen (16) departments (208, 209, 225, 354) and 56 or approximately 36% of the males were employed in these same four departments. There were no males in department 354 and no females in department 327.

(c) As of August 18, 1972 (date complaint filed), there were 336 employees, of these 163 were males and 173 were females. Of the 173 females, 140 or approximately 181% were employed in only four (4) of the sixteen departments (208, 209, 225 and 354), whereas only 62 or 38% of the males were employed in these same four departments. There were no males in department 354 and no females in department 327.

12. An analysis of Plaintiff's Exhibits 19(A) through 19(I) (Labor Reports) shows that the overwhelming majority of the females were employed in only four (4) of the sixteen (16) departments (208, 209, 225 and 354). The percentages of females in these four (4) departments ranged from about 96% as of June 1, 1965, to about 78% as of June 1, 1973.

13. The defendant does not maintain lines of progression within the departments. Promotions, demotions, transfers, layoffs and recalls are governed by "company service credit" which is the seniority standard.

14. Company service, *i. e.*, seniority, is the length of time an employee has been employed at the Charlotte plant from his or her most recent date of hire *minus any and all times* during which the employee has been on lay-off because of a reduction in the work force. For example, the plaintiff, originally employed on July 8, 1952, has a company service date of July 21, 1956 for job progression and lay-off purposes. Plaintiff's seniority standing has been reduced by approximately four years because of five lay-offs she was forced to take before July 2, 1965, and the several times she has been laid off since July 2, 1965 (January 23, 1970 and April 18, 1973).

15. From 1956, when the Charlotte plant re-opened, until November 18, 1969—more than four years after the effective date of Title VII—the defendant maintained an open and declared policy and practice of segregating its work force based on sex.

16. The job assignment policy set forth in the 1959 employee handbook provided that:

For the purpose of job placement, increases and reduction in force, the following related job groups have been established:

(1) All female jobs and (2) all male jobs, except as may be included in other special groups as machine shop, routine inspection, mail service employees, female service employees, etc.

Job assignment procedures [*i. e.*, promotions, demotions, lay-offs and recalls] shall be applied within each job group separately and action resulting therefrom shall be limited to each such group. (Brackets supplied).

17. The job assignment policy set forth in the 1964 employee handbook provided that:

For the purpose of job placement, increases and reductions in force, the

following related job groups have been established:

(1) All female jobs except those included in Group #2.

(2) Female employees—Control Laboratory.

(3) All male jobs except those included in Groups #4, 5 and 6.

(4) Machine Shop.

(5) 440 Department.

(6) Male employees—Control Laboratory.

Job Assignment procedures shall be applied within each such group separately and action resulting therefrom shall be limited to each such group.

18. The number of jobs limited to males was almost twice the number of jobs availabe to females.[2]

19. Prior to June 23, 1965, separate male and female seniority rosters were maintained. Males were hired into, promoted to, and laid off from those jobs limited to males and were credited with company service (seniority)[3] only as to the male jobs. The same practice was followed with respect to the jobs limited to females.

20. Prior to July 2, 1965, female employees were allowed to perform male jobs if they so requested; however, if females took male jobs, they were not allowed to qualify for the jobs, nor could they keep the jobs to avoid lay-offs because of the defendant's strict policy and practice of laying off employees based on the sex-segregated seniority rosters.

21. One result (but an important result for purposes of this case) of the separate male and female job classifications and seniority rosters set out in Findings 15, 16, 17, 18 and 19, *supra,* was that it was possible, and indeed did occur, that female employees would be laid off on the basis of their company service as compared to other females, while male employees with less company service and/or even later dates of original hire were retained. Whenever this situation did occur, the junior males who were retained gained company service and the females who were laid off lost company service.[4]

22. The result set out in Findings No. 21 is exactly the situation of what has happened to the plaintiff. The plaintiff was initially hired at the Charlotte plant on July 8, 1952. Between July 8, 1952 and August 20, 1973 she was laid off seven (7) times, thereby losing company service of about four years. A summary of plaintiff's lay-offs is as follows:

| | |
|---|---|
| Hired 7–2–52 | Original company service (CS) date of 7–2–52 |
| Laid off 12–13–53 | |
| Rehired [5] 5–2–55 | Adjusted CS 11–14–53 |
| Laid off 7–15–55 | |
| Rehired 9–28–55 | Adjusted CS 1–25–54 |
| Laid off 2–24–61 | |
| Rehired 8–21–61 | Adjusted CS 7–21–54 |
| Laid off 9–28–62 | |
| Rehired 2–11–63 | Adjusted CS 12–3–54 |
| Laid off 4–3–64 | |
| Rehired 1–25–65 | Adjusted CS 9–25–55 |

2. Defendant, in answers to interrogatories (Plaintiff's Exhibit 2(B)), identified approximately 97 jobs (including the trainees II and I and the A and B classifications in department 327) as exclusively reserved for males, and approximately 47 jobs as exclusively reserved for females.

3. See Finding No. 14, *supra.*

4. The opposite result could also occur, and did. But see Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969), reversing in part, 272 F.Supp. 332, 344–345 (N.D.Ind. 1967) where the district court found that the sex segregated seniority system there involved had a similar effect on males and females as in the instant case.

5. Recall from lay-off is referred to as a "rehire".

Laid off 1–23–70
Rehired 7–20–70    Adjusted CS 3–20–56

Laid off 4–18–73
Rehired 8–20–73    Adjusted CS 7–21–56

23. All of the lay-offs in which plaintiff was involved prior to 1965 were the result of the sex segregated policies of the defendant; none of these lay-offs were the result of pregnancy leaves.

24. The following males have original hire dates subsequent to that of the plaintiff and none of them have been laid off at any time, including the January, 1970, and the April, 1973 lay-offs in which plaintiff was involved. Each has as his company service date his date of original hire; thus each has a competitive advantage as to seniority standing for job progression and protection from lay-offs superior to that of the plaintiff: [6]

| Name | Date of Most Recent Hire | Company Service |
|------|--------------------------|-----------------|
| George Hall | 2–6–56 | 2–6–56 |
| Bonner David Twitty | 1–11–56 | 1–11–56 |
| Carroll J. Stokes | 1–2–56 | 1–2–56 |
| Willard Paige | 11–28–55 | 11–28–55 |
| Hallbrook McCaw | 11–14–55 | 11–14–55 |
| Craig Barbee | 10–31–55 | 10–31–55 |
| Marvin Sutton | 10–31–55 | 10–31–55 |
| Bobby Joe McCorkle | 10–31–55 | 10–31–55 |
| Howard Morris | 10–26–55 | 10–26–55 |

25. The following table shows the average time lost from company service credit ("company seniority" as currently defined by the defendant) of males and females within the same year of hire as of the week ending November 26, 1972:

Average Time Lost By Males and Females Between Year of Hire and Week Ending November 26, 1972.[7]

| YEAR OF HIRE | MALE (Average) | | FEMALE (Average) | |
|---|---|---|---|---|
| | Months | Days | Months | Days |
| 1952 | 10 | 26 | 66 | 20 |
| 1953 | 14 | 4 | (no hires shown) | |
| 1954 | (no hires shown) | | (no hires shown) | |
| 1955 | | 5 | 69 | 3 |
| 1956 | 1 | 26 | 85 | 17 |
| 1957 | 15 | 6 | (no hires shown) | |
| 1958 | 13 | 10 | 122 | 14 |
| 1959 | (no hires shown) | | (no hires shown) | |
| 1960 | 7 | 25 | (no hires shown) | |
| 1961 | 11 | 20 | 50 | |
| 1962 | 10 | 16 | (no hires shown) | |
| 1963 | 10 | 18 | (no hires shown) | |
| 1964 | 8 | 15 | (no hires shown) | |
| 1965 | 9 | 20 | 24 | 3 |
| 1966 | 15 | 16 | 25 | 18 |
| 1967 | 18 | 12 | 25 | 1 |
| 1968 | 25 | 19 | 31 | 27 |
| 1969 | 27 | 13 | (no hires shown) | |
| 1970 | 10 | 6 | 16 | 7 |
| 1971 | 8 | 7 | 10 | 29 |

6. Other male employees who were initially employed after the plaintiff and who have a superior competitive seniority standing are set forth in Laslie's deposition (Plaintiff's Exhibit 9(A)), and Plaintiff's Exhibit 36(B), which shows hire dates and company service dates of male and female employees.

7. The table is based on Plaintiff's Exhibit 36(B). The table was prepared by the plaintiff as follows: First, the difference in months and days between hire date and company service date as of November 26, 1972 was determined. This total was computed for each male hired in the same year and divided by that number. The same procedure was used for females. Each month was assumed to be 30 days with the exception of those employees who had a hire date or service date that falls on the 31st day of the month. For example, entry No. 316, p. 12 of Plaintiff's Exhibit 36(B), Leazer—1578,

26. In June, 1965, just over a week before the effective day of Title VII (July 2, 1965), the defendant adopted a twenty-five (25) pound weight limitation policy. This policy was announced to employees at the Charlotte plant on June 23, 1965, by the plant manager. The pertinent portion of that policy is as follows:

Beginning July 2, 1965, in order to comply with the effective date of the new Civil Rights Act, we will consider men and women, based on Company Service, for any job opening for which they can meet the qualifications. Only in cases where State or Federal law place restrictions on use of females will a job be considered as a "Male job" only. Generally, for instance, most state laws prohibit the employment of females in plants on the following occupations or capacities: "freight handling, trucking, or the frequency or repeated lifting of weights over 25 pounds". *The State of North Carolina leaves the weight factor to the judgment of management. In order that our plants may have a consistent policy, we have adopted the 25 pound maximum weight limitation.* North Carolina does have a law restricting all female employees to a maximum of a nine hour day in a manufacturing plant. We will, of course, have to comply with this and use this law in determining whether or not a job will be male or female. In addition, the duties of such job as janitor or matron may require limiting them to male and female employees.

*This makes it necssary to abolish our present practice of having separate male and female employee seniority groups other than those jobs requiring specific skills, such as machine shop, 440 department, and Routine Process Inspector.*

In the future job placement procedures, as well as laying-off and rehiring employees, will be handled on the basis of length of service [8] regardless of whether it is a male or female, except in such instances where the job requires males only or females only. (Emphasis supplied).

27. The State of North Carolina does not have (and never did have at any time material to this case) a law imposing a weight limitation on jobs females could perform, and the decision to adopt a weight lifting requirement was based on federal court decisions from other jurisdictions.

28. The twenty-five pounds weight limitation policy adopted by the defendant in June, 1965, was a new policy and was used to designate jobs as either male jobs or female jobs. Jobs requiring lifting or an exerted force [9] of twenty-five pounds or less were considered female jobs and jobs requiring exerted force of twenty-five pounds or more were considered male jobs. See Finding 9, *supra*.

29. The defendant, at or about the same time that it adopted the weight lifting requirement, abandoned its sex segregated jobs and rosters and classified the jobs as "male" or "either". The jobs classified as "either" were open to males and females whereas the jobs classified as "male" were limited solely to males. All of the jobs previously reserved for females were opened to males; however, only a few

---

male, hire date 12–31–58, continuous service date 12–31–58. Fractions of days equaling .5 and below were dropped and fractions of days exceeding .5 were added to the total; e. g., 20.42 days was entered as 20 days and 19.55 days was entered as 20 days.

8. "Length of service" is the same thing as company service. See Finding No. 14, *supra*.

9. The terms "weight lifting" and "exerted force" may be used interchangeably herein, but both terms will have the same meaning whenever used. The term "exerted force" is the term used in the job analyses (Plaintiff's Exhibit 24(A)), whereas the term "exerted force (or lifting)" may be used in the job descriptions (Plaintiff's Exhibit 24(B)).

jobs previously reserved for males were opened to females.

30. The restriction on jobs designated as "male jobs" instituted in June, 1965, remained in effect until November 18, 1969, and female employees were not considered for these jobs and were not given the opportunity to demonstrate their ability to perform these under any circumstances.

31. In addition to the weight restriction to carve out certain jobs for males, the defendant also relied on N.C.G.S. § 95–17 which limited the number of hours an employer could employ a female person to not more than forty-eight hours a week, or nine hours in any one day, or on more than six days in any period of seven consecutive days. However, between July 2, 1965, and November 18, 1969, when the defendant of its own accord eliminated the restriction on the number of hours a female could work in any one week, the work schedules established at the Charlotte plant were so arranged such that if females were allowed to qualify for male jobs, the defendant would not have been in violation of N.C.G.S. § 95–17.

32. As a result of the policies and practices set out in Findings 28 and 29, the plaintiff, between July 2, 1965, and November 18, 1969, was denied the opportunity to qualify for certain jobs reserved for males because of her sex on the basis of the defendant's stereotyped characterization of the sexes without regard to plaintiff's individual preferences and ability.

33. On November 18, 1969, a notice was posted on the bulletin boards at the Charlotte plant announcing the adoption of a new policy. The pertinent portions of that November 18, 1969, notice are as follows:

From a plant standpoint we will be guided by these new decisions, and put into effect the following changes immediately:

1. *All* restrictions regarding the *number of hours a woman can work in any one day or week are eliminated.*

2. Job offering procedures will be handled as follows:

   a. Jobs having weight lifting requirements of thirty pounds or less, which are referred to as "Light" jobs will be offered according to the present regular job placement procedures. (This represents no change).

   b. Jobs requiring lifting of over thirty pounds, or comparable exerted force, referred to as "heavy" jobs, will be offered to men in accordance with present procedure. *However, any female may request any* "Heavy" *job and will be considered, in line with her company service credit, for such opening.* Naturally all qualifications for and requirements of the job would have to be satisfactorily met.

3. *In case of a reduction-in-force, a female employee will not be forced into a "heavy" job, and may elect lay-off if that is the only job available. The practice of not forcing a female employee to take "heavy" jobs will also be followed on any reduction within any department or related group.* (Emphasis in the original).

34. The thirty-pound weight limitation adopted in November, 1969, as was the twenty-five pound limitation adopted in June, 1965, was based on court decisions and was used to distinguish between male and female jobs.[10]

---

10. Several months before the November 1969 announcement, a memorandum from the defendant's Rocky River, Ohio, Divisional Headquarters was sent to the plant manager at the Charlotte plant stating, *inter alia*:
Subject: Weight Limitations—Female Employees

*Several months ago a study was made to determine the effect of allowing women to lift more than 25 pounds at our plants and warehouses.* The study was precipitated by recent Federal Court decisions which ruled that the use of 30 and 35 pound weight limitations in establishing

35. The notice of the policy change announced in November, 1969, provided that female employees had to request heavy jobs. The intendment of this notice was that if females did not specifically request "heavy" jobs, they would not be considered for the "heavy" jobs. Although Moffitt, the then Charlotte plant manager, testified that a decision was made at the corporate level that the part of the November, 1969 policy providing that females had to specifically request heavy jobs would not be enforced, he also testified that his corporate decision was never formally announced to the employees.

36. Male employees were automatically considered for heavy jobs as a result of the November, 1969 policy change; they did not have to specifically request these jobs. In addition, male employees were eligible for all jobs previously reserved for females as a result of the policy adopted by the defendant in June, 1965. Finding No. 29, *supra.*

37. The decision to institute a weight-lifting limitation for female jobs at the Charlotte plant was made at the defendant's Divisional Headquarters in Rocky River, Ohio. The weight-lifting requirement was made applicable to the Charlotte plant because the defendant wanted the policy to be consistent at all of its plants. The defendant's weight lifting limitation policy was based on the Ohio statute, R.C. § 4107.43, which prohibited the employment of females in jobs requiring frequent or repeated lifting in excess of 25 pounds.

38. In 1972 the Ohio Supreme Court in Jones Metal Products Co. v. Walker, 29 Ohio St.2d 173, 281 N.E.2d 1 (1972) ruled that R.C. § 4107.43 was pre-empted by Title VII under the Supremacy Clause of the Constitution and that it could not be enforced in Ohio for that reason. The United States District Court for the Southern District of Ohio reached the same results on March 24, 1971 in Ridinger v. General Motors Corp., 325 F.Supp. 1089, 1093–1097, and the Sixth Circuit in General Electric Co. v. Hughes, 454 F.2d 730 (1972) affirmed the granting of an injunction against appropriate officials of Ohio in the enforcement of R.C. § 4107.43.

39. The policy announced in the November. 18, 1969, notice remained in effect until shortly before the January 19, 1973, lay-off. In January, 1973, the defendant notified the employees that beginning with the job moves associated with the January 19, 1973, lay-off, men would be offered the opportunity to accept lay-off rather than being forced to take a "heavy" job.

40. The defendant's thirty-pound weight limitation policy has not been eliminated; it remains in full force and effect, notwithstanding the fact that the defendant in November, 1969, eliminated its policy of not allowing females to work on certain jobs because of defendant's alleged reliance on N.C.G.S. § 95–17 (Finding No. 31, *supra*), even though the Attorney General of North Carolina issued an opinion on November 25, 1969 (40 N.C.A.G. 363) stating that N.C.G.S. § 95–17 would be enforced, and notwithstanding Finding No. 38, *supra*.

41. The policies and procedures for filling vacancies at the Charlotte plant are as follows:[11]

(a) Employees within the particular department where the vacancy occurs

---

female jobs is considered to be reasonable and fair. These court cases were brought about by female employees who questioned a company's right to set a maximum weight limit on the weight females could lift. In view of this development and the fact that questions had been asked by a few of our hourly female employees about this matter, we felt we should reconsider our long-standing position of limiting fe-male employees to a 25 pound maximum. *After considering all factors we feel we can increase the maximum lifting limitations to 30 pounds and be within what would be considered to be a fair standard.* (Emphasis supplied).

11. Both the procedure for filling job vacancies and for reduction in the work force (lay-offs) involve all kinds of modifications

are given first preference. This preference is, in effect, departmental seniority. (See Plaintiff's Exhibit 17 which is an announcement made to employees on January 13, 1970, wherein it was stated ". . . our regular job-filling procedure *has* always recognized departmental rights".)

(b) Second preference is given to employees in other departments who have, prior to the time the vacancy occurs, submitted a written request for a transfer to the department in which the vacancy occurs, and the desired shift must be indicated on the request for a departmental transfer.[12]

(c) A request for departmental transfer is valid only until the employee has accepted, refused or is laid off.

(d) Notices of vacancies are not posted and employees must rely on word-of-mouth information about vacancies.

(e) The only reason advanced by the defendant for not posting vacancies is that it has never been the policy of the company to do so.

(f) A regular job vacancy is defined as a job opening which is expected to exceed or does exceed two (2) weeks duration and does not result from disability, scheduled vacation, leave of absence or loan of the regular job holder. All other vacancies are temporary vacancies, including job openings of regular employees who are absent due to disability not to exceed 26 weeks.

(g) The significance of defining a temporary vacancy so as to include job openings due to disability is that employees who cover the jobs during the period of disability assume the company service standing of the disabled employees and assume all of the job rights of the absent employee.

42. The policy of the defendant to give first preference to employees in the department in which vacancies occur puts female employees at a competitive disadvantage *vis-a-vis* their male counterparts because the overwhelming majority of the female employees are in only four of the sixteen departments. See Findings 10, 11 and 12, *supra.*

43. The lay-off procedures presently in effect at the Charlotte plant as of January 13, 1970, are set forth in Exhibit A attached hereto.

44. The lay-off procedures set forth in Exhibit A attached hereto are the same procedures used in the April 18, 1973 lay-off, except that males were given the option of refusing to take "heavy" jobs.

45. In addition to the lay-off procedure set forth in Exhibit A hereto, the

---

and priorities. Compare Plaintiff's Exhibit 3(B), pp. 59–73; Plaintiff's Exhibit 3(D), pp. 65–83, and Plaintiff's Exhibit 3(E), pp. 68–80. Officials of the Company have recognized that these procedures are complicated. Shore, plant manager, so testified. (See also Plaintiff's Exhibit 9A, Laslie, p. 71, "It is complicated"; Plaintiff's Exhibit 11, Humphreys, p. 52). A more apt description is "confusing". The Court will not attempt to summarize all of the modifications and priorities for the reason that most of the more detailed modifications and priorities probably will be eliminated as a result of the modifications that will be ordered.

The Company has abandoned its practice with respect to the use of "home department" in determining the priorities for filling vacancies. However, reference to "home department" was still used in setting forth the vacancy filling procedures in the 1973 Employee Handbook. Presumably, the Company will delete the reference to "home department" in the next printing of the handbook.

12. The defendant has a separate form which is used in connection with a job change within a particular department. Requests for departmental transfers are filed with the Head of Employee Relations; requests for job changes within departments are filed with the departmental supervisor.

If an employee does not specifically request a transfer to department 327 (skilled trades) on the request for departmental transfer, generally the employee will not be considered for vacancies in 327.

The 1973 Employee Handbook provided that an employee could not specify a specific job in the request for departmental transfer.

following practices are applicable to lay-offs:

(a) Lay-offs are based on company service.

(b) None of the lists of employees to be laid off (original or final) are posted.

(c) Jobs to be operated during lay-off are not posted and employees are notified of whatever jobs may be available to them by word of mouth.

(d) Job rights of absent disabled employees are exercised by less senior employees who are performing the jobs of the absent disabled employees. See also Findings 42 and 43, *supra*.

(e) Prior to the April, 1973, lay-off, employees in department 327 (skilled jobs), 355 (routine or process inspectors) and 440 (machine adjusters) were not subject to the lay-off procedures applicable to other employees. The jobs in these departments are some of the highest paying, nonsalaried positions at the Charlotte plant. Traditionally, the positions in these departments have been reserved for male employees. See Finding No. 7, *supra*. Employees entering into these departments are required to pass several tests. See Findings Nos. 49 and 59 *infra*. However, female employees were not permitted to take these tests until late 1970.

(f) Male employees in departments 327, 355 and 440 who were laid off out of these departments had a choice of either accepting lay-off from the department, or if they had enough company service and had been upgraded from one of the production departments, they could "bump down" into production to avoid lay-off.

(g) In April, 1973, the special protection given to employees in depart-

ments 355 and 440 was eliminated and jobs in these departments were subject to regular lay-off procedures. The special protection for male employees in department 327 was not removed and employees in this department continue to enjoy special protection.

46. Prior to recalling any employees from lay-off, employees then in the plant are given first preference to available job vacancies. One of the officials of the Company described the effect of the longstanding policy and practice by stating that " . . . when we were going to increase our production the first thing that we would do is that we would re-arrange the plant and therefore, as a rule, the *more desirable jobs* are taken by those people who are in the plant and *the less desirable* jobs are left for new people being hired or people being called back from lay-off."

47. The defendant does not have any standarized procedure for advising employees on lay-off of the availability of job openings. In some instances employees are notified by telephone; in other instances they are notified by letter simply stating that jobs are available without specifying what jobs are available; yet in other instances, employees are notified by letter that jobs are available and the available jobs are listed.

48. Ninety-five percent (95%) of the female employees who have been laid off have returned as compared to sixty to seventy percent (60–70%) of the males who have returned from lay-off.[13]

49. Between 1950 and 1952 the defendant adopted the Test of Mechanical Comprehension ("Bennett Mechanical") and the Modified Alpha Examination, Form 9, that persons interested in jobs in departments 327, 355 and 440 were required to successfully pass before they

---

13. The high rate of return of females from lay-offs formed the basis for the defendant to conclude in its 1973–74 Affirmative Action Plan that the Charlotte plant has been a desirable place for women to work and that the defendant had experienced no difficulty in obtaining female employees with requisite skills to fill jobs.

were considered for these jobs.[14] Incumbent male employees already in these departments at the time tests were instituted were not required to take or pass these tests in order to retain their jobs.

50. Female employees were not allowed to take the Modified Alpha and the Bennett Mechanical until late 1970.[15]

51. Between 1965 and August, 1970 (before any females were permitted to take the tests), over 100 males were permitted to take the Modified Alpha and the Bennett Mechanical; of these, more than twenty (20) had scores sufficient to qualify them for consideration for employment in either 327, 355 or 440. (See Plaintiff's Exhibit 33, e. g., Entries Nos. 3, 4, 9, 13, 14, 15, 16, 30, 33, 38, 39, 40). Many others had scores sufficient to qualify them for jobs in at least one of the departments.

52. Of the fourteen (14) females who took the Bennett, only three had scores sufficient to qualify them for jobs in department 327 (Id., Entries Nos. 131, 139, 157, and 159). Moreover, defendant's own expert witness testified that males tend to score higher than females on the Bennett.

53. Of the females who took both the Bennett and the Modified Alpha, only one (1) scored sufficiently to qualify her for a position in either of the three departments (Id., Entry No. 131).

54. Of the 132 males and the 17 females who took the Bennett Mechanical between 1965 and December, 1970 (when test discontinued), the average (mean) score for females was 25.44 and for men 34.02—a difference of 8.58 points. A larger percentage of males than females received scores exceeding the passing or cut-off levels on the Bennett necessary for consideration for promotion to vacancies in departments 327, 355 and 440. The highest cut-off score for obtaining a job was 35 (department 327). Fifty-seven percent (57%) of the males but only twenty-four percent (24%) of the females who took the Bennett scored above 35. The lowest cut-off score for a job was 30 (department 355). Sixty-seven percent (67%) of the males and only forty-one percent (41%) of the females scored above 30. (This Finding is based on Plaintiff's Exhibit 33).

55. On the Modified Alpha, a general intelligence test, females who took the test had a mean score of 76.97 and males had a mean score of 79.56 (Id.).

56. Defendant's own testing expert testified on direct examination that females tend to score less well on the Bennett than do males.

57. In December, 1970, the defendant stopped using the Bennett Mechanical and the Modified Alpha and on June 30, 1971, and so notified its employees. The decision to discontinue these tests was made by the then plant manager, Moffett.

58. The Modified Alpha and Bennett Mechanical were never validated (i. e., shown to be job related) because it was determined by the defendant that the size of the sample at the Charlotte plant would not be large enough to be statistically significant.

59. On July 30, 1971, one month after the employees had been notified that the modified Alpha and Bennett Mechanical had been discontinued, the defendant substituted new test requirements for departments 355 and 440; and on September 8, 1972, new test requirements were substituted for department 327.

---

14. Different passing scores on each test were established for each department:

| Department | Alpha | Mechanical Comprehension |
|---|---|---|
| 440 | 75 | 33 |
| 327 | 85 | 35 |
| 355 | 100 | 30 |

15. The plaintiff testified that she was not aware of the tests until shortly before she first took the tests in 1970. The Plaintiff's Exhibit 33, which was compiled from Plaintiff's Exhibit Nos. 14c and 15c which are documents showing the test scores of employees, males and females, who took the Bennett Mechanical and the Modified Alpha.

60. A passing score of 70% was established for the new tests. The 70% passing score was established based on the experience as a teacher of one of the officials at the Charlotte plant.[16]

61. No validation studies were conducted with respect to the new tests.

62. Incumbent employees (all males in departments 355 and 440) were not required to take the new tests in order to retain their jobs and were thus "grandfathered" into their positions in these departments [17] on the basis of tests which the defendant has not demonstrated to be job related.[18]

63. The defendant compiles two company service rosters—one showing the standing of employees by department and another roster showing the plant-wide company service standing. If an employee wants to know his departmental standing he must ask his departmental foreman; if the employee wants to know his plant-wide standing he must go to the Employee Relations Department.

Neither of these rosters has ever been posted.[19]

64. The defendant maintains and compiles job descriptions and job evaluations. If an employee has any questions about whether the work he is asked to perform is covered in his job, he has an opportunity to see the job description; however, he is not given the opportunity to see the job evaluation. The job evaluations are more detailed than the job descriptions setting forth such factors as exerted force, training time, rate of pay and other items.[20]

65. Even though the job evaluations may have both an average and a maximum weight lifting or exerted force factor, the job descriptions which are shown to the employees state only the maximum weight lifting or exerted force element.

66. The defendant never had a female foreman at the Charlotte plant until shortly after the complaint was filed

16. The official was unable to state whether an employee making a score of 65 on these tests might be able to successfully perform on the jobs in question.

17. There were over sixty (60) males in departments 327, 355 and 440 as of July 2, 1965 as compared to two (2) females (See Finding No. 8, *supra*). See Griggs v. Duke Power Co., 420 F.2d 1225, 1247 (4th Cir. 1970) (dissent by Sobeloff, J.).

18. The EEOC, "Guidelines on Employment Selection Procedures", provide in Section 1607.11 that:

The principle of disparate or unequal treatment must be distinguished from the concepts of test validation. A test or other employee selection standard—even though validated against job performance in accordance with the guidelines in this part—cannot be imposed upon any individual or class protected by Title VII where other employees, applicants or members have not been subjected to that standard. Disparate treatment, for example, occurs where members of a minority *or sex group* have been denied the same employment, promotion, transfer or membership opportunities as have been made available to other employees or applicants. Those employees or applicants who have been denied equal treatment, because of prior discriminatory practices or policies, must at least be afforded the same opportunities as had existed for other employees or applicants during the period of discrimination. Thus, no new test or other employee selection standard can be imposed upon a class of individuals protected by Title VII who, but for prior discrimination, would have been granted the opportunity to qualify under less stringent selection standards previously in force. (Emphasis supplied).

19. Seniority rosters are computerized and are readily available.

20. All or substantially all of the job descriptions and job evaluations contain the following paragraph:

"The description of this job covers only a general outline of the duties of the job. Due to the varied nature of day time operation, it is impossible to include in detail all of the miscellaneous tasks that the job may require from day to day. In every instance, the operator is expected to produce a full eight-hour's task and that the supervisor, when possible, will endeavor to provide a full eight-hour's work."

on August 18, 1972.[21]  Foreman is a salaried position.

67.  The procedure for selecting foremen (forepersons) is as follows: Whenever a vacancy for additional personnel occurs, the Plant Manager, the Head of Employee Relations, and the General Foreman, each makes individual lists of candidates.  Each then rates each of the candidates as their first, second and third choices.  The respective lists of candidates are then compared and the names of candidates with the most first choice votes are submitted to divisional headquarters in Rocky River, Ohio. Three names are generally submitted to divisional headquarters for a final decision.

68.  Frances Black was the first female foreman at the Charlotte plant.

69. ˙ Frances Black was employed on January 3, 1967, as a secretary to the Head of Industrial Engineering and held that position until she was promoted to foreman on September 1, 1972.  At the time of her promotion to foreman her salary increased from $7,140 to $9,000 yearly.

70.  The defendant has hired or promoted more than 20 persons as foremen or salaried personnel since July 2, 1965.; of these, only three have been females.[22]

71.  None of the female employees promoted to or assigned to foreman or supervisory positions after 1965 were formerly hourly paid employees, whereas a number of the males promoted after this date were formerly hourly paid employees.

72.  The procedures used by the defendant for the selection of foremen and salaried personnel are based on purely subjective standards and there are no safeguards in these procedures designed to avert discrimination against females in selecting foremen and other salaried personnel.[23]

73.  As a Federal Government Contractor, the defendant has an obligation to prepare and execute affirmative action programs.  See n. 1 *supra*.  Notwithstanding the defendant's commitment and obligation to the principle of the affirmative action programs, no efforts were made, nor were any programs established, nor were any detailed analyses of defendant's female work force made until the defendant prepared its 1973–74 Affirmative Action Program.

74.  Although the defendant stated in its 1971 Affirmative Action Program that an in-depth analysis of its seniority practices had been made, it simply had not been done.

75.  There has never been a labor organization to represent employees at the Charlotte plant.

76.  On or about August 22, 1972, shortly after the complaint was filed in this court, the defendant posted a notice on the bulletin board about the filing of the complaint.  The notice stated, among other things, that the company had expected a ruling from EEOC that no discrimination was involved prior to the time that the complaint was filed, and that prior to the filing of the complaint in federal court, the company believed that the employment discrimination claim asserted by the plaintiff was more of a personal matter between the company and the plaintiff.  The defendant says that notice of the complaint was posted because of media coverage of the filing of the case and the number of questions raised by other employees concerning the filing of the case.  The Court finds no impropriety in the posting of the notice.

---

21.  The defendant had several females who were classified as linesmen during World War II; however, they were hourly-paid employees whereas foremen are salaried personnel (PX 9A, Laslie, pp. 49, 52).

22.  Frances Black, Johnnie Covington and Carol Betzold.

23.  See Rowe v. General Motors Corp., 457 F.2d 348, 358–359 (5th Cir. 1972).

77. On January 31, 1973 plaintiff accepted a connector's job.[24] Although the plaintiff had worked as a connector before this date and was considered a qualified connector, she had never performed this particular job to which she was assigned in January, 1973. Plaintiff was advised that she would have six days to qualify; however, she was not given any instructions or training prior to the assignment. During the six days qualifying period Jimmy Smith was assigned to plaintiff as back up help, to catch those connections missed by the plaintiff. Jimmy Smith had never before been assigned to do this particular connection on a regular basis when the line was running. Three days after the plaintiff had been on this connection, she requested and received some assistance from Jessie Teeter because she did not believe that she was "catching on" as quickly as she should. At no time during plaintiff's qualifying period did her foreman or supervisor advise her that she was not making sufficient progress or that her reject rate was higher than the established standards, even though both her departmental foreman (C. R. Garner) and her immediate foreman (Clyde Williams) testified that they observed throughout the qualifying period that the plaintiff was not performing at a satisfactory pace. Plaintiff was never advised by her supervisor and foreman that she was not performing satisfactorily until the actual date of her disqualification.

78. On February 9, 1973, plaintiff was notified that she was disqualified as a connector. She was given a choice of "giving up" the job or being disqualified. During the qualification period plaintiff was earning $3.65 per hour; when she was disqualified, she was assigned to a job at a rate of $3.00 per hour.

79. Plaintiff filed a grievance protesting her disqualification. During the process she discussed the matter with Florence Laslie, Head of Employee Rela-

tions. Laslie advised plaintiff at one point that if plaintiff were willing to state that she was "nervous and upset" during the six-day qualification period, the disqualification would be removed from her record and plaintiff would be eligible for future connecting jobs.

80. At the time plaintiff was disqualified in February, 1973, the defendant had a policy that if an employee is disqualified as a connector, the only circumstances under which an employee can return to that classification is if there is a major change in the operation of the job or if there are extenuating circumstances approved by the plant management allowing the person to return to the classification.

81. Notwithstanding the practice set out in Finding 80, *supra,* plaintiff was assigned a different connecting job in the socket department to cover for an employee absent because of illness.

82. When plaintiff was recalled from lay-off, she was advised by John Vann, then Head of Employee Relations, of a number of jobs available to her; however, it was only after plaintiff specifically inquired about a connecting job that she was advised of the availability of this position. She was then advised by Vann that the rate of pay for connecting was $3.80 per hour; however when she returned to work from recall to a connecting position she was given a learner's rate of $3.65 per hour, and had to qualify for the position again.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction under Section 706(f)(1), of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e–5(f)(1). (Ruling of the Court made during the trial).

2. The defendant Union Carbide Corporation is an employer within the meaning of Section 701(b) of Title VII, 42 U.S.C. Section 2000e(b) and is engaged in an industry affecting com-

---

24. A connector's duties are to connect wires to a battery with the use of a soldering iron.

merce within the meaning of 42 U.S.C. Section 2000e(b).

3. The plaintiff has complied with the procedural requirements of Sections 706(b),(e) and (f)(1) of Title VII, 42 U.S.C. Sections 2000e–5(b), (e) and (f)(1).

4. The relevant time period for determining defendant's liability and plaintiff's entitlement to relief is at and before the suit was filed. While the defendant's more recent practices may have a bearing on the question of relief, they do not affect the determination whether the defendant previously violated Title VII. United States v. International Brotherhood of Electrical Workers, Local No. 38, 428 F.2d 144, 151 (6th Cir. 1970), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); United States v. Dillon Supply Co., 429 F.2d 800 (4th Cir. 1970); United States v. Chesapeake & Ohio Ry. Co., 471 F.2d 582 (4th Cir. 1972); cert. denied sub nom., Local 268 Broth. of R. R. Trainmen v. United States, 411 U.S. 939, 93 S.Ct. 1893, 36 L.Ed.2d 401 (1973); United States v. Central Motor Lines, Inc., 338 F.Supp. 532, 556 (W.D.N.C.1971).

5. Statistics carry much weight in cases brought under Title VII of the Civil Rights Act of 1964. Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377, 1382 (4th Cir. 1972), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L. Ed.2d 246 (1972); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973); United States v. Central Motor Lines, Inc., 338 F.Supp. 532, 556 (W.D.N.C.1971); Young v. Edgcomb Steel Co., 363 F. Supp. 961 (M.D.N.C.1973), reversed on issue not here involved, 499 F.2d 97 (4th Cir. 1974).

The statistics in this case which reflect that the overwhelming majority of females, including the plaintiff, in the Charlotte plant are employed in only four (4) out of the sixteen (16) departments, establish a *prima facie* showing that the defendant has discriminated against its female employees because of sex. Wetzel v. Liberty Mutual Insurance Co., 372 F.Supp. 1146, 1154 (W.D. Pa.1974); Bowe v. Colgate Palmolive Co., 416 F.2d 711 (7th Cir. 1969), affirming in part and reversing in part, 272 F.Supp. 332 (S.D.Ind.1967); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970).

6. The statistics and other evidence further establish that at the defendant's Charlotte plant females were, as recently as August, 1972, totally excluded from all jobs in Departments 327 and 440.

7. The *prima facie* case of discrimination in violation of Section 703(a), 42 U.S.C. Section 2000e–2(a) established by the statistics is confirmed by evidence that the defendant has engaged in the following discriminatory employment practices:

A. In June, 1965, the defendant, although abandoning its separate seniority rosters and job classifications based on sex, established categories designated "male" or "either". Females were not considered under any circumstances for those jobs designated as male jobs.

B. In June, 1965, the defendant established a twenty-five (25) pound weight limitation, the effect of which was to continue the male and female job classifications which existed prior to that date.

C. In November, 1969, the defendant adopted a policy of designating jobs as either "heavy" or "light". The defendant also increased its twenty-five (25) pound weight limitation to thirty (30) pounds. The thirty (30) pounds weight limitation and the designation of jobs as either "heavy" or "light" had the effect of distinguishing jobs at the Charlotte plant as either male or female. Females were not considered for jobs designated heavy unless they specifically requested such a job.

D. Female employees were not allowed to take any tests administered for entry into departments 327, 355 and 440 prior to August, 1970; and when the de-

fendant abandoned the Modified Alpha and the Bennett Mechanical because it could not demonstrate that these tests were job related, the employees in these departments, all of whom were males, were not required to take the new tests instituted in 1971 as a prerequisite to retaining their jobs. The new tests instituted in 1971, and which are presently in use, have not been shown to be job related under the EEOC, "Guidelines on Employee Selection Procedures". 29 C.F.R. Section 1607.1–14, 29 C.F.R. 1607; 35 Fed.Reg. 1233 (Aug. 1, 1970).

E. The weight limitation policies established by the defendant are based on sterotyped characterization of females and males because of sex.

■ 8. Title VII of the Civil Rights Act of 1964 was designed "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of . . . employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent cannot be maintained if they operate to 'freeze' the status quo of prior discrimination practice". Griggs v. Duke Power Co., 401 U.S. 424, 429–430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); Collins v. Union Carbide Corp., 371 F.Supp. 260, 264–265 (S.D.Tex.1974); Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969) and 489 F.2d 896 (7th Cir. 1973); Danner v. Phillips Petroleum Co., 447 F.2d 159 (5th Cir. 1971); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968).

■ 9. Where, as in this case, a company has in the past operated a sexually segregated system of employment in which assignments to particular job classifications and departments were restricted on the basis of sex, the continued reliance on a seniority system (i. e., company service) which gives male employees a competitive advantage over female employees in terms of promotions, transfers, lay-offs and recalls, perpetuates the effects of past discrimination and constitutes a present pattern or practice of impermissible discrimination against female employees, depriving them of employment opportunities and adversely affecting their status as employees because of their sex within the meaning of Section 703(a)(2), 42 U.S.C. Section 2000e–2(a)(2). Bowe v. Colgate-Palmolive, supra; Ostapowicz v. Johnson Bronze Co., 369 F.Supp. 522 (W.D.Pa.1973); Danner v. Phillips Petroleum, 447 F.2d 159 (5th Cir. 1971), affirming 3 EPD ¶ 8336 (W.D.Tex., May 18, 1970); Diaz v. Pan American World Airways, Inc., 442 F.2d 385 (5th Cir. 1971), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); Chrapliwy v. Uniroyal, Inc., 6 FEP Cases 98 (N.D.Ind., July 5, 1973), and 7 FEP Cases 343 (N.D.Ind., February 27, 1974). See also, Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); United States v. Chesapeake & Ohio Ry. Co., 471 F.2d 582 (4th Cir. 1972); Rock v. Norfolk & Western Ry. Co., 473 F.2d 1344 (4th Cir. 1973); cert. denied, sub. nom. United Transportation Union, Lodge No. 550 v. Rock, 412 U.S. 933, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973); United States v. Central Motor Lines, 338 F.Supp. 532 (W.D.N.C.1971); Hairston v. McLean Trucking Co., 62 F.R.D. 651–669 (M.D.N.C.1973); Russell v. The American Tobacco Co., 374 F.Supp. 286 (M.D.N.C.1973); Young v. Edgcomb Steel Co., 363 F.Supp. 961 (M.D.N.C. 1973), reversed on ground here not relevant, 499 F.2d 97 (4th Cir. 1974).

■ 10. Where, as in this case, a company has in the past operated a sexually segregated system of employment in which assignment to, lay-off from, and recall to job classifications were done on the basis of sex, the adoption of a job allocation procedure which distinguishes between "light" and "heavy" jobs constitutes an unlawful employment practice where it operates as a disguised form of classification by sex, and creates unreasonable obstacles to the advancement by females into jobs which females would reasonably be expected

to perform. EEOC, "Guidelines on Discrimination Because of Sex", 29 C.F.R 1604.3(a) and (b); Laffey v. Northwest Airlines, Inc., 366 F.Supp. 763 (D. D.C.1970), order entered 374 F.Supp. 1382 (D.D.C., April 3, 1974); Rinehart v. Westinghouse Electric Corp., 4 EPD ¶ 7520 (N.D.Ohio, August 11, 1970); Cheatwood v. South Central Bell T. & T. Co., 303 F.Supp. 754 (N.D.Ala.1969); Bowe v. Colgate-Palmolive Co., *supra*; Trivett v. Tri-State Container Corp., 368 F.Supp. 137 (E.D.Tenn.1973); Taylor v. Goodyear Tire & Rubber Co., 6 FEP Cases 50, 57 (N.D.Ala., July 31, 1972) (jobs designated heavy and light).

■ 11. Where, as in this case, a company has historically classified its employees on the basis of sex, it is impermissible for the company to rely on word-of-mouth notice of job vacancies. Brown v. Gaston County Dyeing Machine Co., 457 F.2d, *supra*, at 1383; United States v. Dillon Supply Co., 429 F.2d 800, 802 (4th Cir. 1970).

12. The question whether the defendant discouraged its female employees, including the plaintiff, from accepting heavy jobs in 1970 and thereafter is immaterial to the issue whether the defendant practiced discrimination in its employment practices from and after July 2, 1965. Wetzel v. Liberty Mutual Ins. Co., 372 F.Supp. 1146, 1154 (W.D. Pa.1974).

■ 13. Under Title VII, 42 U.S.C. Section 2000e–7, reliance on state laws cannot justify discriminatory practices where such laws conflict with federal laws. Schaeffer v. San Diego Yellow Cabs, Inc., 462 F.2d 1002, 1005 (9th Cir. 1972) (state law on work week for women); Rosenfeld v. Southern Pacific Co., 444 F.2d 1219, 1225–1227 (9th Cir. 1971).

■ 14. Only if a challenged practice is found to be essential to overriding, legitimate, non-sexual business purpose, such as safety and efficiency, can the practice in question be allowed to stand. Robinson v. Lorillard Corp., 444

F.2d 791, 797–798 (4th Cir. 1971) (there must be no acceptable alternative which would better accomplish the business purpose); Griggs v. Duke Power Co., *supra*; Wetzel v. Liberty Mutual Ins. Co., *supra*. The defendant has failed to show that the practices here challenged are supported or required by business necessity.

■ 15. In order to rely on the bona fide occupation qualification exception set forth in Section 703(e), 42 U.S.C. Section 2000e–2(e) with respect to its weight lifting policy, the defendant has the burden of proving by a preponderance of the evidence that all or substantially all females would be unable to perform safely and efficiently the duties of the jobs involved. Weeks v. Southern Bell T. & T. Co., 408 F.2d 228, 232 (5th Cir. 1969); Bowe v. Colgate-Palmolive Co., 416 F.2d *supra*, at 717–719; Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1199 (7th Cir. 1971); EEOC Guidelines on Discrimination Because of Sex, 29 C.F.R. Section 1604.3(b). The defendant has not met this burden.

■ 16. Where an employer has engaged in a pervasive practice of discrimination on account of sex, affirmative and mandatory relief is required in order to insure full enjoyment of the right to equal employment opportunities. In ordering relief, a court should not parrot the Act, but should order affirmative relief which is appropriate to insure the full enjoyment of employment rights. United States v. Dillon Supply Co., 429 F.2d 800, 804 (4th Cir. 1970); Local 53, Asbestos Workers v. Vogler, 407 F.2d 1047, 1052–1053 (5th Cir. 1969).

17. In such cases the court has not merely the power but the duty to render a decree which will as far as possible eliminate the discriminatory effects as well as bar like discrimination in the future. Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); Rosen v. Public Service Electric and Gas Co., 477 F.2d 90, 95–96 (3rd Cir. 1973) (sex discrimination).

18. In order to remedy the present and continuing discrimination based on sex and to remedy the competitive seniority disadvantage to the plaintiff stemming from the defendant's pre-1965 practices of maintaining segregated jobs and rosters, and promotions, transfers, lay-offs and recall procedures based on sex:

A. There must be a modification of reliance on company service seniority and departmental preference in defendant's vacancy filling procedure.

B. The defendant will be required to institute a seniority system based on revised seniority dates for purposes of promotions, departmental transfers, lay-offs and recalls. Collins v. Union Carbide Corp., 371 F.Supp. 260, 266–268 (S.D.Tex.1974); Bowe v. Colgate Palmolive Co., 489 F.2d 896 (7th Cir. 1973), affirming, 6 FEP Cases 1123 (S.D.Ind. 1972); Watkins v. United Steel Workers of America, AFL–CIO, 369 F.Supp. 1221 (E.D.La.1974); United States v. Central Motor Lines, Inc., 338 F.Supp. 532, 560 (W.D.N.C.1971); Chrapliwy v. Uniroyal, *supra*; Danner v. Phillips Petroleum Co., *supra*; Guthrie v. Colonial Bakery Co., 6 FEP Cases 663 (N.D.Ga., March 8, 1973).

C. The defendant will also be required to post in conspicuous places throughout the Charlotte plant notice of all vacancies and rosters showing such revised seniority standing of all employees. Young v. Edgcomb Steel Co., 363 F.Supp. *supra*, at 972 (M.D.N.C. 1973), reversed on issue here not relevant, 499 F.2d 97 (4th Cir. 1974). Guthrie v. Colonial Bakery Co., 6 FEP Cases 662, 665 (N.D.Ga., March 8, 1973).

D. The defendant will be enjoined from giving first preference to employees in the plant when vacancies occur during the periods when a reduction in the work force is in effect, and all vacancies at all times will be offered to employees on the basis of the revised date of seniority. Guthrie v. Colonial Bakery Co., 6 FEP Cases 662 (N.D.Ga., March 8, 1973); Bowe v. Colgate-Palmolive Co., 489 F.2d 896 (7th Cir. 1973).

E. The defendant will be enjoined from requiring the plaintiff to successfully pass any tests currently used for jobs in departments 327, 355 and 440 because her male counterparts in these departments were not required to take these tests. Griggs v. Duke Power Co., 420 F.2d 1225, 1231 (4th Cir. 1970) (see also dissent by Sobeloff, J., 420 F.2d at 1247); Ostapowicz v. Johnson Bronze Co., 369 F.Supp. 522, 539 (W.D.Pa. 1973); NAACP v. Beecher, 504 F.2d 1017 (1st Cir. 1974). Russell v. American Tobacco Co., 374 F.Supp. 286 (M.D. N.C.1973); Young v. Edgcomb Steel Co., 363 F.Supp. 961 (M.D.N.C.1973).

F. The defendant's weight lifting limitation policy should be discontinued. Weeks v. Southern Bell T. & T., *supra*; Schaeffer v. San Diego Yellow Cab, *supra*; EEOC Guidelines on Discrimination Because of Sex, 29 C.F.R. 1604.4.

19. Where employment discrimination has been clearly demonstrated, employees who have been victims of that discrimination must be compensated if economic loss can be established. Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (5th Cir. 1974); United States v. Georgia Power Co., 474 F.2d 906, 921 (5th Cir. 1973); Moody v. Albemarle Paper Co., 474 F.2d 134 (4th Cir. 1973); Rosen v. Public Service Electric and Gas Co., 477 F.2d 90, 95–96 (3rd Cir. 1973).

20. The statistics showing the foreman and supervisory work force by sex and the defendant's reliance on subjective criteria for the selection of its supervisory work force demonstrate that defendant has discriminated against its female employees in the selection of its supervisory personnel. Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972); Gilmore v. Kansas City Terminal Ry., 509 F.2d 48 (8th Cir. 1975); Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377, 1382–1385 (4th Cir. 1972).

21. The defendant has intentionally engaged in the unlawful employment practices described herein within the meaning of Section 706(g) of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e–5(g). Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); Schaeffer v. San Diego Yellow Cabs, Inc., 462 F.2d 1002, 1006 (9th Cir. 1972).

22. Plaintiff is entitled to recover her costs and reasonable attorneys' fees as part of her costs.

23. The clerk is requested to set this case for a conference among court and counsel to try to arrive at a method of establishing appropriate revised seniority dates for the plaintiff and other female employees, and to draft an appropriate order.

## EXHIBIT A TO
## FINDINGS OF FACT

RULES GOVERNING THE LAYOFF ON JANUARY 23, 1970, AT THE CHARLOTTE PLANT

1. Determine the level of operation needed to meet the demand for batteries.

2. Determine the number of employees needed to operate at this level and make staffing sheets accordingly.

3. Determine the excess number of employees in the plant. This becomes the number of employees to be laid off.

4. Departmental Foremen announced the layoff and explained the effect on this layoff of the new court ruling governing weight restrictions for women. One member from the Plant Manager's Department or Employee Relations Department attended the departmental meetings to help answer questions.

5. Make a temporary layoff list by listing the youngest employee in the plant according to company service until the prescribed number for layoff is reached.

6. On paper, remove the laid off employees from the departments.

7. On the basis of the new requirements, determine the employees to remain in each department and the employees to be set aside on the surplus list.

8. The surplus employees from each department comprise the plant wide surplus list.

9. The jobs left unfilled by the removal of the employees on layoff become the job opening list.

10. After laid off and surplus employees are removed from the departments, rearrangements are made within each department.

11. Those remaining in the departments may turn down jobs within their department. The opening created will be filled by offering it to those employees from that department on the surplus list. If no one wants the opening, the youngest employee in terms of company service from that department will be forced to take the opening. An employee who elects to go on the surplus list loses his home department rights unless it is a case of a woman being offered a heavy job.

12. After all departments have completed their respective rearrangements, the resulting job openings are offered in accordance with company service to those employees who are on the surplus list or who have in requests.

13. Men on the list may take light jobs if they have enough company service to get them. If only heavy openings are left, men are required to take them.

14. Women can take heavy or light openings if their company service warrants. However, women cannot be forced to take heavy openings.

15. The point is reached where there are only heavy openings available and

only women are left to take them and they refuse. The youngest employees in terms of company service on light jobs in the plant, men or women, are removed from their jobs and set aside in their respective departments until a sufficient number of openings for those women on the surplus list is attained.

16. The employees remaining in the departments are then given the chance to rearrange to the resulting openings. Those employees on heavy jobs who have less service than the oldest employee on the surplus list will not be allowed to rearrange to a light job. Those employees on heavy jobs who have more service than the oldest employee on the surplus list are given the opportunity to rearrange to the light jobs. All remaining employees on light jobs may rearrange according to the vacancy filling procedure to light jobs since this does not affect the number of light jobs available.

17. Those employees removed from light jobs then have the opportunity to displace employees in their department on heavy jobs who have less company service than they. The total number of employees on heavy jobs with less company service than those removed from the light jobs are removed from their jobs. The department is again rearranged according to the vacancy filling procedure. The remaining openings are then offered to those employees in the department who have been removed from their jobs to the point where there are still enough light jobs available for the women on the original surplus list.

18. The light jobs created for the women on the original surplus list are then offered to them.

19. All those employees removed from their jobs to create openings for others with more company service are then offered the plant wide openings which in all probability are heavy openings. All men must take these jobs. Women may take the heavy jobs or elect layoff. For the number of women electing layoff, a corresponding number of men or women will be recalled from the layoff list to fill the heavy openings.

20. Women on the layoff list may elect to take the heavy openings or remain on the layoff list. Men must take the heavy openings.

21. These heavy openings are offered to those recalled from the layoff list according to company service. If one recalled from layoff is from a department where there is an opening, he does not have home department rights but can only get in that particular department if he had enough company service to warrant him a chance.

ORDER AMENDING AND SUPPLEMENTING FINDINGS OF FACT

This cause coming on to be heard on motion of Defendant for an order amending the findings of fact and conclusions of law heretofore filed by the Court, and the Court having heard arguments of counsel and considered exhaustive proposed changes and additions, it is

Ordered, that the Motion to amend findings of fact is denied as to paragraphs 5, 6, 8, 10, 11, 12, 15, 19, 24, 26, 28, 29, 30, 33, 34, 38 and 40 of Defendant's Motion.

Ordered, that the Motion to add findings of fact is denied as to paragraphs 1, 7, 13, 17, 20, 23 and 48 of Defendant's Motion.

Ordered, that the following additional findings of fact be made:

1. Objections were made by the defendant to the introduction of evidence or to the consideration of evidence as to the charges contained in Plaintiff's Exhibit 1(e), which is the charge dated February 25, 1971, filed by the Plaintiff with the EEOC. After getting all of the files of the Equal Employment Opportunity Commission and examining them,

the following is found to be the sequence of events: Plaintiff's letter charge to the EEOC (Plaintiff's Exhibit 1A), dated March 30, 1970, containing certain charges was filed on April 14, 1970. Plaintiff's Exhibit 1B, another letter to EEOC making a complaint, was filed on June 22, 1970. Plaintiff's Exhibit 1C, a charge on EEOC Form 5, was filed on October 19, 1970. Plaintiff's Exhibit 1D, an amended additional charge, was filed on February 16, 1971. The filing of Plaintiff's Exhibits 1A, 1B, 1C and 1D were communicated in due course to the Defendant. A later charge, Plaintiff's Exhibit 1E, is a further charge, dated February 25, 1971, bearing EEOC case File No. TAT1–2569. Plaintiff's Exhibit 1E was missing from the original file received by the Court from the EEOC but was discovered in a separate file, No. TAT1–2569. From the EEOC file stamps and from a communication from the Equal Employment Opportunity Commission, dated October 12, 1971, the Court finds that this charge (Plaintiff's Exhibit 1E) was filed with Mr. Nails of the EEOC on or about February 25, 1971, and it bears a February 25, 1971 stamp of the Atlanta office of the EEOC. The difference in the numbers on these charges results from the fact that the TAT numbered files are original Atlanta files, and when these cases were transferred in the early or middle part of 1971 to the Charlotte District Office of the EEOC, they were given Charlotte file numbers which begin with the code letters TCT. The original Atlanta file in Plaintiff's case, TAT1–2569 is now and since mid-1971 has been Charlotte File No. TCT2–0346. It further appears that on May 27th of 1971, following some findings of the field director, Mrs. Nance wrote the EEOC a lengthy letter referring to the February 25, 1971 claim or charge (Plaintiff's Exhibit 1E) complaining about it and requesting additional action. It further appears that as of April 3, 1972 a formal notice, EEOC Form 131, was sent to the Defendant giving notice under File No. TCT2–0346

of a charge under date of February 25, 1971, alleging discrimination on the basis of sex in promotions, job classifications, and terms of conditions of employment. Inferentially, this appears to be the charge in question, although the Court can make no positive finding to that effect. From the foregoing, the Court finds that all of the claims advanced in Plaintiff's Exhibit 1E, that is, the charge of February 25, 1971, were fully advanced before the Commission and were considered or should have been considered by the Commission in the preparation of its final action leading up to the issuance of the right to sue letter (Plaintiff's Exhibit 1F). It, therefore, appears that the charges contained in Plaintiff's Exhibit 1E are proper subjects of evidence in this case if they are relevant under the pleadings and general issues raised in the suit.

The record is not clear as to when the Defendant actually received notice that the amended charge of February 25, 1971, had been filed. The Court ruled that unless there was some clear-cut evidence that the claims included in the February 25, 1971 charge constituted a complete surprise to the Defendant and that entertaining them at trial would constitute gross unfairness to the Defendant, the Court intended to proceed with the evidence without further inquiry on the particular subject. (Tr. 125–129; Court Exhibit No. 1). The Defendant failed to demonstrate that the February 25, 1971 charge constituted surprise or that it would be grossly unfair for the Court to entertain the claims contained in that charge.

2. More than 80% of Union Carbide's Charlotte production is batteries for the United States military. The level of production and employment fluctuates depending on the Defendant's ability to secure government contracts. The cyclic nature of this business requires frequent layoffs and recalls (Def. Ex. 1, 8a; Tr. 446–448).

3. The Plaintiff has been affected by three layoffs since the passage of Title

VII. She was laid off in 1970 and 1973 rather than accept a heavy job. She avoided layoff in 1972 by accepting a heavy sweep and move job in Department 225. The jobs offered to the Plaintiff at the time of all three of these layoffs were based on the Plaintiff's company service standing or seniority which is the subject of Findings of Fact Nos. 19–24 filed April 28, 1975. (Def. Ex. 4; Ex. 10 to Pl. Ex. 9A; Tr. 490, 560).

4. Prior to being laid off on January 23, 1970, the Plaintiff was offered and turned down twenty-five (25) jobs.[1] If she had accepted one of these jobs, she would not have been laid off but would have remained in the plant and continued to accrue Company service (Tr. 478). The Plaintiff was offered jobs in Departments 208, 210, 225, 300, 327, 342 (Def. Ex. 6c, 6d, 6e; Tr. 477–478). Less senior employees accepted the jobs turned down by the Plaintiff and thereby remained in the plant and continued to accrue Company service. The Plaintiff remained on layoff until July 20, 1970.

5. On March 13, 1970, while on layoff, the Plaintiff was offered seven (7) jobs.[2] Had she accepted one of these seven (7) jobs she would have been recalled from layoff. She refused these jobs and they were taken by less senior employees (Tr. 603–605). On May 18, 1970, while still on layoff, the Plaintiff was offered three (3) jobs which she refused.[3] On July 20, 1970, the Plaintiff accepted a job as a conveyor expediter and was recalled from layoff (Def. Ex. 4; Ex. 10 to Pl. Ex. 9A).

6. On February 7, 1972, the Plaintiff was again involved in a plant rearrangement and layoff. She was forced off of her line assembly job in Department 225 but avoided being laid off by accepting a sweep and move (heavy) job in the same department (Def. Ex. 4; Ex. 10 to Pl. Ex. 9A).

7. On April 18, 1973, the Plaintiff was laid off. Prior to electing layoff, she was offered, and refused, approximately sixteen (16) jobs. Had the Plaintiff accepted one of these sixteen (16) jobs, she would have remained in the plant and continued to accrue Company service (Def. Ex. 7a, 7b, 7c). The Plaintiff remained on layoff until August 20, 1973, when she was recalled as a Connector in Department 225 (Def. Ex. 4).

8. The Plaintiff has been offered jobs in Departments 208, 209, 210, 225, 300, 327, 330, and 342 in connection with the 1970 and 1973 layoffs (Def. Ex. 6c, 6d, 6e, 7a, 7b, 7c; Tr. 477–478, 603–604).

9. In December, 1970, the Defendant discontinued its practice of requiring candidates for Departments 327, 355, and 440 to take and pass the Modified Alpha and Bennett Mechanical Exams. The Defendant substituted a "Mathematical Skills Inventory" test for candidates for Department 355. The record shows that sixteen (16) employees have taken this new test: eight (8) males and eight (8) females. Of the eight (8) males who have taken this test, five (5) passed and three (3) failed. Of the eight (8) females who took this test, six (6) passed and two (2) failed.

1. One (1) feeding job in Department 225; one (1) AC Line takeoff job in Department 225; one (1) A feeder job in Department 225; two (2) sweep and move jobs in Department 225; one (1) line assembly job in Department 225; two (2) upstairs packing jobs in Department 225; one (1) spare heavy job in Department 208; one (1) recovery coordinator job in Department 210; one (1) maintenance job in Department 327; three (3) material handler jobs in Department 342; two (2) heavy janitor's jobs in Department 330; one (1) scrap hauler truck driver's job in Department 342; eight (8) machine cleaner's jobs on second shift (Tr. 477–478).

2. One (1) supply and shovel job in Department 208; one (1) sweep and move job in Department 208; five (5) machine cleaner's jobs in Department 330 (Tr. 603).

3. One (1) material handler's job in Department 342 and two (2) machine cleaner's jobs in Department 300 (Tr. 604).

It is further ordered, that the Findings of Fact heretofore filed by the Court be amended as follows:

1. Add the following sentence at the end of finding of fact number 7:

Skilled jobs specially designated as job classifications 1–7 are all located in Department 327 and include such occupations as electricians, millwrights, mechanics, machinists and welders (Tr. 485).

2. Amend finding of fact number 8 to read as follows:

The majority of male and female employees as of July 2, 1965, and August 18, 1972, were employed in unskilled job classes 1–7. As of August 18, 1972, all of the female employees in job class 9 were employed in Departments 225 and 355. On the same date all male employees in job class 9 were employed in Departments 225 and 355 with the exception of one (1) male employee in Department 235 and two (2) male employees in Department 107. There were forty (40) jobs in wage classification 9 on August 18, 1972; males held twenty-one (21) of these jobs and females held nineteen (19) (Pl. Ex. 35).

3. Amend finding of fact number 9 to read as follows:

All jobs designated as heavy jobs require an employee to exert a force of thirty (30) pounds or more at least one time per eight (8) hour day. Jobs which do not require an exerted force of thirty (30) pounds are classified as light jobs.

4. Amend finding of fact number 16 to read as follows:

The job assignment policy set forth in the 1959 employee handbook provided that:

For the purposes of job placement, increases and reductions in force, the following related job groups have been established:

(1) All female jobs and (2) all male jobs, except as may be included in other special groups such as machine shop, routine inspection, male service employees, female service employees, etc.

Job assignment procedures shall be applied within each such group separately and action resulting therefrom shall be limited to each such group.

5. Amend finding of fact number 18 to read as follows:

Prior to June, 1965, the number of job classifications limited to males was almost twice the number of job classifications available to females (Pl. Ex. 2B, Answers Nos. 14 and 16).

6. Amend finding of fact number 26 to read as follows:

In June, 1965, just over a week before the effective date of Title VII (July 2, 1965), the Defendant adopted a twenty-five pound weight standard. This standard, along with hours, was used to classify jobs as "male" jobs or "either" jobs. This new policy was announced to employees at the Charlotte plant on June 23, 1965, by the Plant Manager. The pertinent portion of that policy is as follows:

Beginning July 2, 1965, in order to comply with the effective date of the new Civil Rights Act, we will consider men and women based on Company service, for any job opening for which they can meet the qualifications. Only in cases where State and Federal laws place restrictions on use of females will a job be considered as a "Male Job" only. Generally, for instance, most state laws prohibit the employment of females in plants in the following occupations or capacities: "freight handling, trucking, or the frequent or repeated lifting of weights over 25 pounds. *The State of North Carolina leaves the weight factor to the judgment of management. In order that our plants may have a consistent policy, we have adopted the 25 pound maximum weight limit.* North Carolina does have a law

restricting all female employees to a maximum of a 9 hour day in a manufacturing plant. We will, of course, have to comply with this and use this law in determining whether or not a job will be male or female. In addition, the duties of jobs such as janitor or matron may require limiting them to male or female employees.

*This makes it necessary to abolish our present practice of having separate male and female employee seniority groups other than on those jobs requiring specific skills such as Machine Shop, 440 Department, and Routine Process Inspectors.*

In the future job placement procedures, as well as laying off and rehiring employees, will be handled on the basis of length of service regardless of whether the employee is male or female, except in instances where the job requires males only or females only (emphasis supplied).

7. Amend finding of fact number 33 to read as follows:

On November 18, 1969, a notice was posted on the bulletin boards at the Charlotte plant announcing the adoption of a new policy. The pertinent portions of that November 18, 1969, notice are as follows:

> From a plant standpoint we will be guided by these new decisions, and put into effect the following changes immediately:
>
> 1. *All* restrictions regarding the *number of hours a woman can work in any one day or week are eliminated.*
>
> 2. Job offering procedures will be handled as follows:

> a. Jobs having weight lifting requirements of 30 pounds or less, which are referred to as "Light" jobs, will be offered according to the present regular job placement procedures. (This represents no changes.)
>
> b. Jobs requiring lifting of over 30 pounds, or comparable exerted force, referred to as "Heavy" jobs, will be offered to men in accordance with present procedure. *However, any* female may *request* any "Heavy" job and will be considered, in line with her Company Service Credit, for such opening. Naturally all qualifications for and requirements of the job would have to be satisfactorily met.
>
> 3. In case of a reduction-in-force, a female employee will not be forced into a "Heavy" job, and may elect layoff if that is the only job available. The practice of not forcing a female employee to take a "Heavy" job will also be followed on any reduction within a department or related job group (emphasis in original).

8. Amend finding of fact number 71 to read as follows:

The Defendant has hired or promoted more than twenty (20) persons to foreman or salaried positions since July 2, 1965; of these five (5) have been females (Pl. Ex. 2A, No. 53).

9. Amend footnote 22 to read as follows:

Frances Black, Johnnie Covington, Carol Betzold, M. B. Hunter, and J. L. Mallonee (Pl. Ex. 2A, No. 53).